## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### (Northern Division)

| | | |
|---|---|---|
| **JEFFRY E. TAYLOR** | * | |
| 3931 Glenhurst Road | * | |
| Dundalk, Maryland 21222 | * | |
| | * | |
|     **Plaintiff** | * | **Civil No.** _____ |
| | * | |
| **v.** | * | |
| | * | |
| **BALTIMORE POLICE** | * | |
| **DEPARTMENT** | * | |
| 601 E. Fayette Street | * | |
| Baltimore, Maryland 21202 | * | |
| | * | |
|     *Serve on:* | * | |
|     Daniel Beck, Esquire | * | |
|     *Chief, Office of Legal Affairs* | * | |
|     100 N. Holiday Street, Suite 101 | * | |
|     Baltimore, Maryland 21202 | * | |
| | * | |
| **KURT ROEPCKE,** Sergeant | * | |
| in his Individual and Official Capacity | * | |
| Baltimore City Police Department | * | |
| c/o 601 E. Fayette Street | * | |
| Baltimore, Maryland 21202 | * | |
| | * | |
| **KEVIN DAVIS,** Former Commissioner, | * | |
| in his Individual and Official Capacity | * | |
| Baltimore City Police Department | * | |
| c/o 601 E. Fayette Street | * | |
| Baltimore, Maryland 21202 | * | |
| | * | |
| **DARRYL DE SOUSA,** Former | * | |
| Commissioner, in his Individual and Official | * | |
| Capacity | * | |
| Baltimore City Police Department | * | |
| c/o 601 E. Fayette Street | * | |
| Baltimore, Maryland 21202 | * | |

|   |   |
|---|---|
| | * |
| **GARRY TUGGLE**, Interim Commissioner, | * |
| in his Individual and Official Capacity | * |
| Baltimore City Police Department | * |
| c/o 601 E. Fayette Street | * |
| Baltimore, Maryland 21202 | * |
| | * |
| **FREDERICK GILBART**, Major, | * |
| in his Individual and Official Capacity | * |
| Baltimore City Police Department | * |
| c/o 601 E. Fayette Street | * |
| Baltimore, Maryland 21202 | * |
| | * |
| **MAYOR AND CITY COUNCIL** | * |
| **OF BALTIMORE** | * |
| 100 North Holiday Street | * |
| Baltimore, Maryland 21202 | * |
| | * |
|     *Serve on:* | * |
|     Andre M. Davis, Esquire | * |
|     City Solicitor | * |
|     100 North Holiday Street | * |
|     Baltimore, Maryland 21202 | * |
| | * |
| **STATE OF MARYLAND** | * |
| c/o Brian Frosh | * |
| Office of the Attorney General | * |
| 200 Saint Paul Place | * |
| Baltimore, Maryland 21202 | * |
| | * |
| **Defendants** | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## COMPLAINT AND REQUEST FOR JURY TRIAL

COMES NOW, Plaintiff, Jeffry E. Taylor, by and through his attorneys, Jo Anna Schmidt, Danielle E. Marone and the law firm of Schmidt, Dailey & O'Neill, LLC, and brings this Complaint for Damages and Request for Jury Trial against Defendants, Baltimore Police Department ("BPD"), Kurt Roepcke ("Defendant Roepcke"), Kevin Davis ("Defendant Davis"), Darryl De Sousa ("Defendant De Sousa"), Gary Tuggle ("Defendant Tuggle"), Frederick Gilbart ("Defendant Gilbart"), Mayor and City Council of Baltimore ("Defendant City"), and the State of

Maryland ("Defendant State") for illegal retaliation in violation of his First Amendment Rights, 42 U.S.C. § 1983, Article 40 of the Maryland Declaration of Rights, and the Law Enforcement Officers' Bill of Rights, Md. Code Ann., Public Safety §§ 3-101 *et seq.*, as well as wrongful employment/labor practices and, as grounds therefore, states the following:

## I.  **JURISDICTION AND VENUE**

1.     This Court has jurisdiction over the claims in this Complaint under 28 U.S.C. §§ 1331 and 1343.

2.     Venue is proper pursuant to 28 U.S.C. § 1391.

3.     Plaintiff provided timely notice of intent to file a claim. *See* Exhibit 1.

4.     The amount in controversy exceeds seventy-five thousand dollars ($75,000.00), excluding interest and costs.

## II. **PARTIES**

5.     At all times material hereto, Plaintiff was employed by the BPD and a resident of Maryland, residing at 3931 Glenhurst Road, Dundalk, Maryland 21222 in Baltimore County, Maryland.

6.     At all times material hereto, Defendant BPD was a municipal agency of the City of Baltimore and/or the State of Maryland and the employer of Defendant Roepcke, and a person within the meaning of 42 U.S.C. § 1983.

7.     At all times material hereto, Defendant Roepcke was employed by the BPD and was a Sergeant in the Special Operations Section/Marine Unit, acting in his capacity as an agent, servant, and employee of the BPD.   Defendant Roepcke is being sued in his official capacity as a police officer for the BPD and in his personal capacity.

8.      Since February 8, 2018, Frederick Gilbart (hereinafter "Defendant Gilbart") has been employed by the BPD and is in charge of Tactical Operations, acting in his capacity as an agent, servant, and employee of the BPD.  Defendant Gilbart is being sued in his official capacity as a police officer for the BPD and in his personal capacity.

9.      At all times material hereto, Defendant City was a municipal government, the employer of Defendant Roepcke and Defendant Gilbart, and was responsible for hiring police officers, including but not limited to, Defendant Roepcke and Defendant Gilbart.  Defendant City, via the Mayor of Baltimore, has appointed BPD Commissioners, Kevin Davis, Darryl De Sousa, and Gary Tuggle, all of whom exercised policy–making authority for the BPD and were charged with functioning as the Police Commissioner and Executive Officer of the BPD.  In directing and supervising the operations and affairs of the BPD, Defendants Davis, De Sousa, and Tuggle are vested with all the powers, rights, and privileges attending the responsibility of management and could exercise the same, where appropriate, by rule, regulation, order or other departmental directive, which was binding on all members of the BPD.  The authority and responsibility vested in Defendants Davis, De Sousa, and Tuggle included, but is not limited to: (1) appointing Deputy Commissioners to serve at their pleasure, and other ranks and positions above the rank of Captain for the purpose of ensuring effective and efficient staffing and operation of the major functional subdivisions of the BPD; (2) determining and establishing classifications of ranks, grades and positions for police officers within the BPD; (3) determining and designating the authority, responsibility, duties, assignments, rights and privileges of each rank, grade or position, and establishing the order of succession to positions of command within the BPD; (4) regulating attendance, conduct, training, discipline and procedure for all members of the BPD and the making of other rules, regulations, and orders as necessary for the good governance of the BPD

and its members; and (5) suspending, amending, rescinding, abrogating or canceling any rule, regulation, order or other departmental directive adopted by them or any former Police Commissioner, and adopting all other reasonable rules, regulations and orders as deemed necessary to enable the BPD to effectively discharge its duties. The BPD is a department of Defendant City, which was responsible for, and through its agents, servants and/or employees, undertook, police functions in the City of Baltimore. Defendants Roepcke and Gilbart were agents, servants or employees of the BPD and the City of Baltimore during the incidents giving rise to the various claims asserted herein. Defendant City is accordingly named as a party and a substitute party defendant under Federal Rule of Civil Procedure 25. Defendants Davis, De Sousa, and Tuggle are being sued in their individual and official capacities.

10.     By Ch. 367 of the Acts of 1867, the General Assembly of Maryland made the BPD an agency of Defendant State. By Ch. 920 of the Acts of 1976, the General Assembly transferred the power to appoint the BPD Police Commissioner from the Governor to the Mayor of Baltimore City.

11.     At all times material hereto, the BPD was acting individually and by and through its actual or apparent agents, servants, and employees, including, but not limited to, Defendants Davis, De Sousa, Tuggle, Gilbart and Roepcke, who were acting within the normal scope of their employment.

### III. FACTS AND ALLEGATIONS COMMON TO ALL COUNTS

12.     Defendant Davis was the Defendant BPD's Police Commissioner from October 19, 2015 until January 19, 2018, when he was fired by Mayor Catherine Pugh.

13.     Defendant De Sousa was Defendant BPD's Interim Police Commissioner beginning on January 19, 2018. He was confirmed as the Police Commissioner on February 28,

2018 and remained in that position until he resigned on or about May 15, 2018 after being criminally charged with failing to file and/or pay personal taxes.

14.     On May 15, 2018, Defendant Tuggle was appointed Defendant BPD's Interim Police Commissioner by Mayor Catherine Pugh.

15.     At all times material hereto, Plaintiff was a police officer employed by the BPD.

16.     Plaintiff was hired by the BPD on October 23, 2000.  He has been assigned to Defendant BPD's Marine Unit since May 2015.

17.     At all times material hereto, Defendant BPD's Marine Unit was comprised of seven (7) officers; namely, Plaintiff, Officer Chris Gesla, Officer Rob Cortina, Officer Brian Wassum, Officer Josh Fidler, Officer Garrett Miller and Defendant Roepcke.  Plaintiff is the 4th senior officer in the Marine Unit.  The highest ranking officer is Defendant Roepcke, who reports to Lieutenant George Hauf ("Lt. Hauf").

18.     At all times material hereto, Lt. Hauf's chain of command was Captain Charles "Chuck" Thompson (Cpt. Thompson), followed by Major Milton Corbett (Maj. Corbett), and Colonel Melissa Hyatt (Col. Hyatt).   Lt. Hauf was located off-site at the BPD's Aviation Unit; therefore, Defendant Roepcke had day-to-day oversight and supervision over the Marine Unit.

19.     In or about November 2016, the BPD Marine Unit, including Plaintiff, was ordered by Defendant Roepcke to start a "salvage operation" for a boat identified as the *Danger Zone*, which was moored and/or anchored in the Baltimore Inner Harbor.  This order came about after a resident in the Tidewater Village Apartments (Baltimore, Maryland), who was an acquaintance of Col. Hyatt, complained that the *Danger Zone* was an "eyesore."  As a result, Col. Hyatt instructed Defendant Roepcke to have the boat removed, despite the fact that the boat was not illegally moored or anchored.

20.    On the first day that the Marine Unit responded to the *Danger Zone*'s location, it was low tide and the boat was sitting atop pilings. Plaintiff sought out Defendant Roepcke and advised that the BPD should not be handling the matter because it was not the job of the BPD to engage in "salvage operations" for boats that did not pose a health or safety risk to the boating public.  Plaintiff suggested that they call a tow boat and/or salvage company because the BPD could also be liable if something occurred during the operation. Plaintiff further advised Defendant Roepcke that the boat was not illegally moored or anchored and that the boat owner had never been issued a citation or enforcement order to move.  Plaintiff reported to Defendant Roepcke that the salvage operation was outside of the authority of the Marine Unit. Despite Plaintiff's arguments and concerns, Defendant Roepcke instructed the Marine Unit to begin salvage operations.  Plaintiff told Defendant Roepcke that he would not participate in illegal activity or actions outside of the authority of the BPD and, therefore, refused to participate in the *Danger Zone* salvage and subsequent recovery efforts unless ordered to do so.

21.    During the Marine Unit's initial efforts to remove the *Danger Zone*, the officers damaged the boat, impaling it on a piling, causing oil, gas, and/or other dangerous liquids to contaminate the Baltimore Harbor.  Defendant Roepcke failed to notify the National Response Center or the U.S. Coast Guard of the oil spill in violation of federal law.  He also used a solid boom that did *not* contain the spill, allowing it to continue to contaminate the Harbor. He also failed to contact a salvage company to assume control of this dangerous situation.  Instead, Defendant Roepcke continued to use BPD personnel and resources over the course of several months to attempt to remedy the situation and salvage the boat.  These efforts included having the BPD pay overtime to members of the BPD Dive Unit to attempt remediation.  When those efforts were unsuccessful, Defendant Roepcke brought in employees from KB Diver Services, a private

organization, to consult on the best method to remove the *Danger Zone* from the piling. Defendant Roepcke allowed KB Diver Service employees to use BPD boats without first obtaining a waiver/release or approval from Lt. Hauf, Cpt. Thompson, or Maj. Corbett.

22.     On January 19, 2017, Plaintiff spoke with Lt. Hauf and several people on the BPD Dive Squad about the *Danger Zone* operations.  He advised Lt. Hauf that he had contacted some salvage and tow companies that would remove the *Danger Zone*, possibly at no cost to Baltimore City.

23.     On January 30, 2017, Plaintiff was approached by some citizens who expressed dissatisfaction with the way the *Danger Zone* salvage was being handled.  They also were upset about the oil and gas spills.  They provided Plaintiff with photographs and a video.  Plaintiff agreed with the citizen's concerns and agreed to speak out about the issue within the BPD. Plaintiff discussed his concerns with Defendant Roepcke and reminded him that he could contact a salvage company.

24.     After Defendant Roepcke failed to stop efforts with regard to the *Danger Zone,* Plaintiff decided to reach outside of his immediate chain of command to protest Defendant Roepcke's actions.  On February 2, 2017, Plaintiff sent an e-mail to Maj. Corbett to inform him about the situation and his concerns with the *Danger Zone* salvage operations.  He wrote the following:

> I know you are very busy but I wanted to inform you of a situation and concerns of the boat Danger Zone.  Several citizens have been expressing concern of the hazards and environmental issues being caused by the actions of the dive team.  A group of bystanders have been taking photos and made the below slide show and the e-mail they sent to me is attached below and they sent it to me two times now.
>
> I know there are programs that remove abandoned vessels and I was told at no cost to the city.  I will get you more information and if

there is any way I can help or answer any questions, I will always be
available for you.

25.     Plaintiff reported to Maj. Corbett the *Danger Zone* salvage was an improper use of

BPD manpower and equipment in that Defendant Roepcke had taken twelve (12) officers, two (2)

boats and a helicopter out of service and outside the BPD's proper duties to engage in the

improper salvage operations.

26.     When Plaintiff reported his concerns regarding the *Danger Zone* salvage to Maj.

Corbett, he was doing so as a private citizen and not within his official duties as a BPD police

officer.

27.     On February 3, 2017, Maj. Corbett responded and acknowledged that "WE" have

been getting several complaints about the boat, but he was being told something "completely

different" about removing the boat.   He requested that Plaintiff provide information from the

salvage companies.

28.     On February 8, 2017, Plaintiff provided Maj. Corbett with information he received

from the Maryland Department of Natural Resources about abandoned vessels in the State of

Maryland.

29.     On February 9, 2017, Plaintiff followed up and explained that he had contacts for

the Abandoned Boat and Debris Program and was advised that there would be no cost to the City.

He also informed Maj. Corbett that "[f]rom the beginning of this situation I voiced my

opinion…and done extensive research and was guided on how to handle the removal of the boat

and cleanup of hazard/waist *(sic)* material spillage."  Later that day, Plaintiff sent a text message to

Maj. Corbett, stating:

Sir I just sent you a reply to the email I hope it helps and you know
you can always call me.

> Because I'm in touch with the community I know how irate they are getting with this situation.
>
> Only because I feel loyal to you I felt I had to advise you of the situation.

30.     On February 13, 2017, Plaintiff again sent an e-mail to Maj. Corbett to follow-up on the information provided regarding the Abandoned Boat Program.  He also reported that Defendant Roepcke and Lt. Hauf were detailing him out of the Marine Unit on February 27, 2017.

31.     Almost immediately after protesting and reporting Defendant Roepcke's actions, Plaintiff was ostracized, threatened, teased, and subjected to severe and pervasive harassment and retaliation by Defendant Roepcke and other BPD officers.

32.     On December 9, 2016, while Plaintiff was in the Marine Unit office, he overheard Defendant Roepcke and Officers Cortina, Miller and Wassum discussing him.  Plaintiff heard Defendant Roepcke and Officer Wassum state that they did not want to work with him and that he was a "rat/snitch."  They continued to discuss Plaintiff in this manner for over 10 minutes, until Officer Miller saw Plaintiff in the office and went into the room to report that he was listening. After the officers left, Plaintiff confronted Defendant Roepcke and told him that it was unprofessional to have such conversations about him.  Plaintiff asked Defendant Roepcke to schedule a meeting with command to resolve the situation, but no meeting was held.

33.     On January 24, 2017, while Plaintiff was working with Officer Gesla, he asked Plaintiff if he knew why Defendant Roepcke was having a meeting with Maj. Corbett.  Plaintiff advised him that he did not know what the meeting was about.  In response, Officer Gesla said "sure you do, you go downtown to tell them everything."  He also told Plaintiff that he might not want to say anything to anybody about what goes on at the Marine Unit because he "could be transferred back to patrol, like they did to Sgt. Atwood."

34.     On February 23, 2017, Plaintiff was helping Officer Gesla with the *Frontier* (one of the BPD police boats) and noticed that whoever had performed winterization activities had not removed the drain plugs or secured the trailer properly.  Officer Gesla called him a "snitch" and remarked that he was going to run and tell Cpt. Thompson.

35.     On April 21, 2017, Defendant Gilbart advised Plaintiff that Defendant Roepcke said *he* (Plaintiff) needed to "stop making grievances of everything and stop mentioning things going wrong."

36.     Defendant Roepcke also engaged in harassing behavior.  On July 14, 2017, he sent Plaintiff an e-mail, stating that he had painted a boat with the "wrong paint."  Defendant Roepcke then **posted** the e-mail on the office wall for everyone in the Marine Unit to see.  He also publicized the e-mail to officers within and outside of the Marine Unit.  By way of contrast, other officer's "bad acts" were not publicized to the Marine Unit or others.  For instance, when Officer Cortina **crashed and wrecked** the *Ram* trailer and Officer Wassum damaged the *Ram*, Defendant Roepcke did not seek to humiliate them and, instead helped to conceal their actions.  Furthermore, when Officer Wassum used the BPD gas card at Bass Pro for non-approved items and the card was deactivated, Defendant Roepcke did not post or publicize his behavior.

37.     On May 15, 2017, Plaintiff's shoes and boots were stolen out of his work locker.  Plaintiff reported the theft to Defendant Roepcke but he did not investigate the matter or take any action.

38.     ·On July 31, 2017, Plaintiff was working when Defendant Roepcke came into the office, saw him, and immediately left the room.  During the shift, while Plaintiff was in the building, he made several attempts to speak with Defendant Roepcke; however, he just ignored

Plaintiff and left the room each time.   Defendant Roepcke continues to ostracize Plaintiff by failing to check in with him during his shifts and avoiding him.

39.     Defendant Roepcke also isolated Plaintiff from activities and events that other members of the Marine Unit are allowed to participate in.   By way of example, on August 24, 2017, Plaintiff was patrolling the harbor at the West Wall and noticed that there was a christening of an Army Corps of Engineers' vessel occurring.   Officer Cortina from the Marine Unit was present.   Plaintiff was not made aware of this event and not asked to participate in the event.

40.     In retaliation for complaining about the *Danger Zone*, on February 9, 2017, Defendant Roepcke advised Plaintiff that he was being detailed to work at Personnel Background Investigations for two (2) months.   Plaintiff protested, stating that the detail needed to be assigned to the Marine Unit member with the ***least seniority*** per the FOP Memorandum of Understanding, which meant that Officer Miller should have been assigned the detail.   When Plaintiff continued to complain about the detail, other officers told him that Defendant Roepcke was going to try and have him permanently transferred out of the Marine Unit.   Fearing further retaliation, Plaintiff accepted the detail.

41.     On February 14, 2017, Plaintiff spoke with Maj. Corbett in reference to the *Danger Zone* and being detailed to Personnel.   Maj. Corbett told Plaintiff that Officer Miller had not been sent on the detail (even though he had less seniority) because it would "look like punishment for the Freddie Gray incident."   This justification is pre-textual because Officer Nero (also involved in the Freddie Gray incident) was detailed from Aviation where he was assigned following his return to work.

42.     During the detail (February 27, 2017 through April 2017), Plaintiff was not afforded the same opportunity to work overtime that was offered to members of the Marine Unit.

The detail and the failure to offer him overtime changed the terms and conditions of his employment and was in retaliation over Plaintiff's whistleblowing activities related to the *Danger Zone*. Even after Plaintiff returned from the detail, he was continually denied overtime opportunities that Defendant Roepcke made available to other members of the Marine Unit.

43.     Furthermore, almost immediately after speaking out about his concerns over the *Danger Zone* salvage and cleanup operations, Plaintiff was subjected to retaliation in the terms and conditions of his employment. Specifically, he was denied training opportunities and work assignments offered to other members of the Marine Unit:

- On February 22, 2017, Officer Taylor was not notified of, or included in, training that was offered by the Coast Guard. The training was offered to Lt. Hauf, Defendant Roepcke and Officers Miller and Cortina. During this time, Officer Miller was supposed to be assigned to administrative duties *only* and should never have been offered such training.

- On May 10, 2017, Plaintiff was specifically excluded from training in Annapolis with the Coast Guard. The training was offered to Defendant Roepcke and other members of the Marine Unit.

- On May 17, 2017 and May 18, 2017, Plaintiff was specifically excluded from training in Annapolis with the Coast Guard. The training was offered to Defendant Roepcke and other members of the Marine Unit.

- On June 1, 2017, when Plaintiff reported for work, he observed that Defendant Roepcke (who had changed his hours from night to day work) and Officer Miller (who was marked on "vacation" in the book) were at work and training

with the FBI's boat squad.  Plaintiff complained to Defendant Roepcke that it was unfair that he was being excluded from training.

- On July 24, 2017, Officer Miller, who is *not* a certified diver, was offered to come into work and assist the dive team in recovering a shotgun thrown into the water in Baltimore County.

- On August 23, 2017, Plaintiff was working and was told by other members of the Marine Unit and ESU that there was an incident of bicycles being recovered from the harbor by other members of the Marine Unit and dive team.  Officer Garrett was assigned to the incident, even though he is *not* a certified diver and a junior member of the Marine Unit.  Plaintiff was not notified of the incident or called in to respond.

- On September 7, 2017, Officer Miller participated in water-testing the surface suit, even though he is not a certified diver and has less seniority in the Marine Unit than Plaintiff.

44.    On April 27, 2017, when Plaintiff was scheduled to return to the Marine Unit following his involuntary detail to Personnel, Defendant Roepcke changed his schedule so that other members of the Marine Unit (including those with less seniority) were accommodated. Defendant Roepcke treated Plaintiff's schedule requests differently and would not offer him accommodations.  For instance, on May 4, 2017, Defendant Roepcke offered overtime to Officer Wassum, a junior member of the Marine Unit, before offering the same position to Plaintiff. In addition, on July 20, 2017, Defendant Roepcke adjusted the roll book to accommodate his dive trainings and Officer Miller for day work, in lieu of his night work schedule.    Furthermore,

Defendant Roepcke would change Plaintiff's schedule without giving proper notice and would deny him overtime opportunities.

45.     On May 30, 2017, Plaintiff received an oral counseling from Defendant Roepcke in reference to complaints with a boat stop with the MDTA that occurred *in 2016*.  In addition, he was placed in an "Early Intervention Program."  Plaintiff told Defendant Roepcke and Sgt. Ames (who was on speakerphone) that the oral counseling was in retaliation for his protest against the *Danger Zone* salvage and the allegations were made without any due process.

46.     On July 4, 2017, Defendant Roepcke provided Plaintiff his performance evaluation (commonly referred to as a "Green Sheet").  Defendant Roepcke completed the evaluation and reported that Plaintiff "needed improvement" in handling citizens and "needed improvement" in taking initiative.  Defendant Roepcke's evaluation was retaliatory for Plaintiff's actions in complaining about the *Danger Zone* salvage.

47.     On July 11, 2017, Lt. Hauf met with Plaintiff and gave him *a second* Green Sheet, dated July 12, 2017. Apparently recognizing that Defendant Roepcke's Green Sheet was biased, Lt. Hauf advised Plaintiff that he wanted it to reflect some positives and elaborated where Plaintiff needed improvement.  Plaintiff told him that he had taken lots of initiatives and that citizens had complimented him on his day-to-day duties and during his interactions with them.  His initiatives included, but were not limited to, creating a daily sign-in sheet for the Marine Unit, a document that Defendant Roepcke refused to implement, maintaining radar certification for use on the water, and volunteer community activities.

48.     Plaintiff reported to Lt. Hauf that Defendant Roepcke's Green Sheet was in retaliation for his complaints about the *Danger Zone* salvage.  He also told him how Defendant

Roepcke was isolating him from the rest of the Marine Unit.   Plaintiff provided additional examples of how Defendant Roepcke was violating Departmental Policy; specifically:

- Defendant Roepcke was giving overtime and comp time to officers working the night shift when they were put on 12-hours shifts that they did not work;

- Defendant Roepcke was using BPD manpower and funds with regard to the *Danger Zone* salvage;

- Defendant Roepcke purchased a used, underwater chainsaw from one of his friends, instead of using the City bidding process; and

- Defendant Roepcke was using BPD officers to work on the *Dauntless, a* Marine Unit vessel, to conceal the fact that the motors had been damaged during the *Danger Zone* salvage operations.

49.    Plaintiff also informed Lt. Hauf that Defendant Roepcke marked him as "Average" on the Green Sheet and treated him differently because other members of the Marine Unit had engaged in more egregious actions.   He reported to Lt. Hauf the following acts or omissions committed by other officers, namely:

- An officer that crashed the *Ram* into the trash boat, causing damage to the front passenger side cross bar windshield;

- Defendant Roepcke and Officer Cortina wrecked the boat trailer for the *Ram,* which still had not been fixed or reported as damaged; and

- The unit had several group meetings for Officers Wassum and Miller because they were yelling at each other on calls in front of citizens.

50.    Rather than taking any action against Defendant Roepcke or the other officers, Lt. Hauf suggested that Plaintiff document his improvements on his next Green Sheet.

51.    On October 3, 2017, Plaintiff was involved in a work injury while at in-service training.   At the time of the injury, Plaintiff was the Officer-In-Charge ("OIC") because his first-line supervisor, Defendant Roepcke, was not working.   However, the injury occurred while Plaintiff was working with Sgt. Wheeler and Lt. Hauf who were his "supervisors" and both were

duly notified of the injury at the time of the occurrence.  Plaintiff also completed an Employee Incident Report on October 3, 2017 and was released to full duty work by Mercy Medical Center PSI (hereinafter "PSI").  Defendant Roepcke had notice of the injury as of *October 4, 2017* because both he and Officer Cortina were telling other members of the Marine Unit what "a piece of shit" Plaintiff was *because* of the work injury.

52.    On October 21, 2017, when Plaintiff woke up, he checked his cell phone and saw that at 5:30 a.m. Defendant Roepcke had called and left a message, saying that he was supposed to be working the 5:00 a.m. to 1:00 p.m. shift for the Baltimore Marathon.  Plaintiff called Defendant Roepcke and asked when his shift had changed.  Defendant Roepcke told him "last Friday." Plaintiff told him that was not, and could not, be true because he had a copy of the schedule.  Later that day, Officer Gesla advised Plaintiff that *he* had been told of the shift change for the Baltimore Marathon two (2) weeks prior.  Defendant Roepcke charged Plaintiff with being AWOL for failing to report to work.  Those charges were later found to be "Not Sustained" after an Internal Affairs investigation.

53.    On October 26, 2017, Plaintiff issued his Notice of Claim - Intent to Sue to (a) the State of Maryland; (b) the Interim City Solicitor; (c) Director Vernon Herron of the BPD's Officer Safety and Wellness Program; and (d) Dan Beck, Esquire, Chief of the Office of Internal Affairs for the BPD.  According to the return of service, Interim City Solicitor received the Notice on October 31, 2017.

54.    When Plaintiff issued his Notice of Claim, he was doing so as a private citizen and not within his official duties as a BPD police officer.

55.    On November 6, 2017, Plaintiff was scheduled to be seen in follow-up for his October 3, 2017 work injury.  While he was parking his departmental vehicle at Mercy Hospital,

he was involved in a minor accident, wherein the top of the vehicle brushed the top of the building. Plaintiff immediately called in the accident to the BPD's Accident Investigation Unit ("AIU"). An AIU investigator came to the scene, performed an investigation, took photographs, and Plaintiff completed all required departmental paperwork. At 2:07 p.m. that day, Plaintiff emailed Defendant Roepcke his light duty form from PSI as a result of the October 3, 2017 injury. He also reported having a very small accident with the Marine Unit truck and having notified AIU. In response, Defendant Roepcke texted Plaintiff, asking him where he had been all day, why he was on light duty, and to call him. Plaintiff spoke with Defendant Roepcke and explained his email.

56. On November 6, 2017, Plaintiff received a Notification of Internal Investigation from Chief Rodney Hill (IAS 2017-0259) regarding an incident with Officer Katie Fox that allegedly occurred when he was temporarily assigned to Special Events in **2010**. Officer Fox's allegations were previously investigated in 2010 and found to have no merit.

57. On or about November 9, 2017, Defendant Roepcke charged Plaintiff with failing to notify him of a work injury that occurred on October 3, 2017. Those charges were investigated by Internal Affairs and ultimately found to be "Not Sustained." Contrary to the Statement of Charges, Defendant Roepcke was personally aware of the work-related injury as of October 4, 2017 and Plaintiff's chain of command was present at the time of the injury and were aware of same at the time the incident occurred.

58. On or about November 9, 2017, Defendant Roepcke charged Plaintiff for failing to report the "accident" with the Marine Unit vehicle that occurred on November 6, 2017.

59. On November 15, 2017, while Plaintiff was working day shift at the Marine Unit, the tires of his vehicle were intentionally damaged due to his whistleblowing activities. Plaintiff

reported the incident to Defendant Roepcke; however, he did not taken any action to investigate the incident.

60.     Following Plaintiff's October 3, 2017 work injury, he was placed on light duty until on or about December 23, 2017, when he underwent surgery.   While on light duty, Plaintiff worked in the Marine Unit, taking inventory of parts and restructuring the inventory list.   He performed those duties until on or about December 23, 2017.

61.     On February 7, 2018, Plaintiff received a Notification of Finding, advising him that a "PCS" finding had been rendered and resulted in a finding of "Sustained" for the allegation of Neglect of Duty regarding the failure to "immediately" report the accident with a departmental vehicle.   Plaintiff was advised that the discipline would be a "severe letter of reprimand" to be placed in his file.   Plaintiff requested to see the proposed letter of reprimand but was not provided with a copy.   Plaintiff declined to accept the proposed discipline.

62.     On or about March 5, 2018, Plaintiff returned to work with Defendant BPD on light duty work on and, instead of returning to work in the Marine Unit, Defendant Gilbart ordered him to report to Headquarters to work in Administration.

63.     On April 20, 2018, charging documents were prepared, reviewed and punishment recommendation was approved by the Disciplinary Review Committee and the Police Commissioner's Designee.   Instead of the "severe letter of reprimand" previously offered to Plaintiff on February 7, 2018, the *new and increased* proposed punishment was (a) involuntary transfer to patrol, (2) severe letter of reprimand, and (3) 10 days suspended without pay.

64.     On April 26, 2018, Plaintiff requested a Trial Board Hearing and, by doing so, was notified that he was subject to any punishment arising out of the hearing board, up to and including termination.

65.     On May 2, 2018, Plaintiff asserted his right to an alternative method of forming the Trial Hearing Board under Md. Code Ann. Public Safety § 3-107.

66.     On May 31, 2018, Plaintiff provided his justification for requesting an alternative method for forming the Trial Hearing Board; namely that (a) twelve (12) days after Plaintiff's Notice of Claim was served upon the BPD, Defendant Roepcke instituted a series of four (4) charges against him for frivolous and/or falsified matters; (b) Plaintiff's tires were damaged on November 15, 2017 in retaliation for his whistleblowing activities; (c) In January 2018, Plaintiff reported Defendant Roepcke for violating BPD policies and procedures related to the 2018 schedule for leave groups and H days;  (d) a citizen, Joanne Bayles, had reported a threat against Plaintiff made by BPD Officer John Potter (a member of the Mounted Unit); and (e) Defendant Roepcke's comments to a fellow officer that it was his intention to get Plaintiff terminated.

67.     On June 4, 2018, Plaintiff filed a Motion to Dismiss the charges against him on the grounds that the entire investigation and process had been irreparably tainted because the Trial Board Case Book included information about Plaintiff's prior non-punitive counseling memoranda.

68.     On June 16, 2018, Defendant Tuggle denied Plaintiff's request for an alternative method of forming the Hearing Board.

69.     On or about July 6, 2018, Plaintiff filed a complaint with the Office of the Inspector General ("OIG") concerning misuse/abuse of BPD resources and whistle-blower retaliation.  In addition to reporting the fraud, misuse and/or abuse of BPD manpower, funds and equipment related to the *Danger Zone* salvage, Plaintiff reported that Defendant Roepcke (a) gave away BPD equipment without any authority from his superiors in order to obtain parts and/or labor to repair various Marine Unit boats; (b) made purchases for boats that were **not** City-owned by using

legitimate City-owned boats with valid shop numbers to mask the fraudulent purchases; (c) engaged in frequent swaps, trades and other illegal transactions to acquire dive equipment without adding the items to the BPD's inventory or assigning a required property number for BPD property valued over $100.00 in violation of BPD General Order 01-87; and, (d) was fraudulently putting in work hours for himself and members of the Marine Unit when they were not working and not entitled to pay (i.e., overtime and "slash days").

70.     When Plaintiff filed his complaint with the OIG, he was doing so as a private citizen and not within his official duties as a BPD police officer.

71.     Plaintiff has provided statements and information to the OIG as they continue their investigation into Defendant BPD's Marine Unit and Defendant Roepcke.

72.     When Plaintiff provided statements and information to the OIG, he was doing so as a private citizen and not within his official duties as a BPD police officer.

73.     On July 31, 2018, in light of Defendant Roepcke's continuing retaliatory actions being taken against Plaintiff, and the real possibility that Plaintiff was going to be terminated if he were to proceed with a Trial Board composed of BPD members, Plaintiff accepted Defendant BPD's original recommendation of a simple letter of reprimand for neglect for failing to *immediately* notify his supervisor of an accident while utilizing a departmental vehicle pursuant to BPD Policy 908.

74.     Defendants Gilbart, Roepcke and Tuggle are aware that the OIG is investigating the Marine Unit and that Plaintiff is the source of the complaint.  Defendants Gilbart and Roepcke have continued to engage in a pattern and practice of retaliating against Plaintiff by (a) ostracizing him; (b) allowing members of the Marine Unit yell, threaten, and harass Plaintiff; (c) failing to investigate Plaintiff's complaints against members of the Marine Unit for yelling and threatening

him; (d) encouraging the other members of the Marine Unit to write grievances or "95s" against Plaintiff; (e) threatening to transfer Plaintiff from the Marine Unit; and (f) ordering Plaintiff to meet with Director Vernon Herron.

75.    On or about September 5, 2018, Plaintiff was released to full duty work following his work-related injury and reported back to the Marine Unit.

76.    On December 13, 2018, Defendant Gilbart met with Plaintiff and told him that he was being "temporarily" moved from the Marine Unit to the Active Shooter Training Unit. During the meeting, Defendant Gilbart threatened Plaintiff, stating that he "wanted Jeff to be able to see his retirement." Defendant Gilbart also told Plaintiff that BPD's legal department had endorsed the action and that he could speak with his lawyer, but that it "wouldn't look favorable for him and that perhaps he should check in with [Director] Vernon again."

77.    On or about December 14, 2018, Sergeant Paul Sinchak from the BPD Bomb Unit sent a text message to the Bomb and Marine Units stating:

> All: I have been notified that Officer Taylor has been ordered to stay away from Quarters by Command.   A new door code will be forthcoming.  He is not to be provided with the new code.  If he needs access to the building he is to contact Lt. Hauf or Maj. Gilbart directly. Compliance is mandatory.  Please reply and acknowledge.

78.    Upon information and belief, Plaintiff has been removed from Defendant BPD's Marine Unit and barred from the premises because he is cooperating with the OIG's on-going investigation.

79.    All of the actions taken by Defendants Davis, De Sousa, Tuggle, Gilbart and Roepcke were taken in their individual and official capacities in the course and scope of their employment with the BPD.

**COUNT I**
**FIRST AMENDMENT RETALIATION – FREEDOM OF SPEECH**
**42 U.S.C. § 1983**
**(All Defendants)**

Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs, as if fully set forth below.

80.     Plaintiff had knowledge of the existence of facts relating to the fraud, misuse and abuse of BPD manpower, resources and equipment and improper acts allegedly committed by Defendant Roepcke and the personnel in the Marine Unit.

81.     Although it was not part of or pursuant to Plaintiff's official duties, as a concerned citizen, he reported the fraud, misuse and abuse of BPD manpower, resources and equipment and improper acts to Maj. Corbett, the State of Maryland, the Interim City Solicitor for Baltimore City, the Chief of Legal Affairs for the BPD, Director Herron and the OIG.

82.     Although it was not part of or pursuant to Plaintiff's official duties, as a concerned citizen, he provided statements, information and documentation to assist the OIG's investigation into the fraud, misuse and abuse of BPD manpower, resources and equipment and improper acts committed by Defendant Roepcke and the personnel in the Marine Unit.

83.     Although it was not part of or pursuant to Plaintiff's official duties, as a concerned citizen, he spoke with Director Herron and OIG investigators about the harassment and retaliation that he was experiencing by the BPD, Defendant Roepcke and other members of the Marine Unit as a result of his reported incidents of fraud, misuse and abuse undertaken by the Defendants.

84.     The harassment and retaliation against Plaintiff and which was permitted and fostered by the BPD was a result of Plaintiff's whistleblowing to the BPD and OIG about Defendant Roepcke's fraud, misuse and abuse of BPD manpower, resources and equipment and improper acts.   Plaintiff has experienced ostracism, taunting, intimidation, personal threats,

damages to his personal property, harassment, multiple false and/or frivolous departmental charges and threatened with termination since blowing the whistle on the police fraud, misuse and abuse by Defendant Roepcke and within the Marine Unit.

85.     Plaintiff's speech and his actions in reporting the police fraud, misuse and abuse by Defendant Roepcke and within the Marine Unit to the BPD and OIG were protected expressions regarding matters of public concern.

86.     Plaintiff asserts that his interest in First Amendment expression outweighs whatever interest the Defendants had regarding maintaining control over the workplace.

87.     Plaintiff asserts that he was unjustifiably subjected to retaliation, harassment, threats and intolerable and hostile work environment by the Defendants as a result of his whistleblowing police misconduct as it pertains to the *Danger Zone* salvage, Defendant Roepcke's practice of abusing overtime, using slash days for members of the Marine Unit and other fraud and abuse being perpetrated by Defendant Roepcke and/or others within the Marine Unit.

88.     Plaintiff asserts that he was unjustifiably charged by Defendant Roepcke and/or other supervisory members of the BPD and investigated by the Internal Affairs Division of the BPD.

89.     Plaintiff asserts that a causal relationship exists between his protected expressions on matters of public concern and these adverse employment actions.

90.     These actions complained of herein violate Plaintiff's right to free speech under the First Amendment of the U.S. Constitution.

WHEREFORE, Plaintiff prays for Judgment:

(a) Issuing an award to compensate for all other non-economic damages incurred by Plaintiff, including but not limited to, the humiliation, stress, mental

anguish, embarrassment and loss of enjoyment of life suffered in an amount no less than $500,000.00;

(b) Alternatively, if compensatory damages are not awarded, issuing an award of nominal damages;

(c) Awarding Plaintiff his costs and reasonable attorney's fees in this action;

(d) Granting punitive damages against the Defendants in the amount of $1,000,000.00; and

(e) Granting such and other further relief as this Court may deem just and proper.

## COUNT II
### FREEDOM OF SPEECH RETALIATION
### Maryland Declaration of Rights, Article 40
### (All Defendants)

Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs, as if fully set forth below.

91.     Plaintiff states that the actions previously complained of herein also violate his right of freedom of speech and expression, as protected by the Maryland Declaration of Rights, Article 40.

WHEREFORE, Plaintiff prays for Judgment:

(a) Issuing an award to compensate for all other non-economic damages incurred by Plaintiff, including but not limited to, the humiliation, stress, mental anguish, embarrassment and loss of enjoyment of life suffered in an amount no less than $500,000.00;

(b) Alternatively, if compensatory damages are not awarded, issuing an award of nominal damages;

(c) Awarding Plaintiff his costs and reasonable attorney's fees in this action;

(d) Granting punitive damages against the Defendants in the amount of $1,000,000.00; and

(e) Granting such and other further relief as this Court may deem just and proper.

## COUNT III
## VIOLATION OF THE LAW ENFORCEMENT OFFICERS' BILL OF RIGHTS
### Md. Code Ann., Pub. Safety Article §§ 3-101 *et seq.*
### (All Defendants)

Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs, as if fully set forth below.

92.    Plaintiff states that the actions previously complained of herein also violate § 3-103(d) of the Law Enforcement Officers' Bill of Rights because Plaintiff has been disciplined, transferred, reassigned or otherwise discriminated against in regard to his employment with Defendant BPD or threatened with that treatment because he has exercised or demanded the rights granted under Md. Code Ann., Public Safety §§ 3-101 *et seq.* and/or he has lawfully exercised his constitutional rights.

WHEREFORE, Plaintiff prays for Judgment:

(a) Issuing an award to compensate for all other non-economic damages incurred by Plaintiff, including but not limited to, the humiliation, stress, mental anguish, embarrassment and loss of enjoyment of life suffered in an amount no less than $500,000.00;

(b) Alternatively, if compensatory damages are not awarded, issuing an award of nominal damages;

(c) Awarding Plaintiff his costs and reasonable attorney's fees in this action;

(d) Granting punitive damages against the Defendants in the amount of $1,000,000.00; and

(e) Granting such and other further relief as this Court may deem just and proper.

**COUNT IV**
**WRONGFUL EMPLOYMENT PRACTICE**
**(All Defendants)**

Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs, as if fully set forth below.

93.    The Maryland Legislature has created a cognizable statutory interest in the ability to report crimes without fear of retaliation in terms of personal or property damage.  Likewise, the BPD strictly prohibits purposeful retaliation against or interference with a member who reports or seeks to report violations of law and/or BPD policy, procedures, or rules.

94.    Plaintiff states that the actions previously complained of and, more particularly, those materially and retaliatory adverse employment actions, including but not limited to, (a) being ostracized, threatened, teased; (b) being detailed to work at Personnel Background Investigations for two (2) months; (c) being denied overtime opportunities offered to other members of the Marine Unit; (d) being denied training opportunities and work assignments offered to other members of the Marine Unit; (e) having his work schedule modified without notice; (f) being subjected to oral counseling from Defendant Roepcke; (g) being given retaliatory Green Sheets by Defendant Roepcke; (h) being charged by Defendant Roepcke and/or other supervisory members of the BPD on November 6, 2017, and twice on November 9, 2017 and the discipline imposed thereof; and (i) being involuntarily transferred out of the Marine Unit on December 13, 2018, constitute a wrongful employment practices in violation of Maryland's and his employer's clear mandate to protect whistleblowers.

95.     Plaintiff asserts that a causal relationship exists between his disclosure of police fraud, misuse and abuse by Defendant Roepcke and within the Marine Unit and the adverse personnel actions.

WHEREFORE, Plaintiff prays for Judgment:

(a) Issuing an award to compensate for all other non-economic damages incurred by Plaintiff, including but not limited to, the humiliation, stress, mental anguish, embarrassment and loss of enjoyment of life suffered in an amount no less than $500,000.00;

(b) Alternatively, if compensatory damages are not awarded, issuing an award of nominal damages;

(c) Awarding Plaintiff his costs and reasonable attorney's fees in this action;

(d) Granting punitive damages against the Defendants in the amount of $1,000,000.00; and

(e) Granting such and other further relief as this Court may deem just and proper.

## COUNT V
## INDEMNIFICATION
### (Defendants BPD and City)

Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs, as if fully set forth below.

96.     Maryland law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

97.     Upon information and belief, there is a Memorandum of Understanding in place between Defendants Roepcke and City requiring Defendants BPD and City to indemnify

Defendant Roepcke for judgments arising from acts committed within the scope of his employment.

98.   Defendant Roepcke is an employee of Defendant BPD who acted within the scope of his employment in committing the misconduct described herein.

_____
Jo Anna Schmidt, Esquire (Bar #10155)
Danielle E. Marone, Esquire (Bar #27835
Schmidt, Dailey & O'Neill, LLC
300 East Lombard Street
Suite 1440
Baltimore, Maryland 21202
Phone: (410) 783-1296
Fax: (410) 783-1316
jschmidt@sdolaw.com
dmarone@sdolaw.com
*Attorneys for Plaintiff, Jeffry E. Taylor*

## DEMAND FOR JURY TRIAL

The Plaintiff, Jeffry E. Taylor, by and through undersigned counsel, hereby demands a jury trial as to all issues triable by a jury.

_____
Jo Anna Schmidt, Esquire (Bar #10155)
Danielle E. Marone, Esquire (Bar #27835
Schmidt, Dailey & O'Neill, LLC
300 East Lombard Street
Suite 1440
Baltimore, Maryland 21202
Phone: (410) 783-1296
Fax: (410) 783-1316
jschmidt@sdolaw.com
dmarone@sdolaw.com
*Attorneys for Plaintiff, Jeffry E. Taylor*